UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

------------------------------------------------------------------------x
                                                            :           CIVIL ACTION NO.
IN RE HUMANA, INC. SECURITIES LITIGATION          :            3:08CV-00162-JHM
                                                            :
------------------------------------------------------------------------x

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on a motion by Defendants, Humana Inc., Michael McCallister, James Bloem, and James Murray, to dismiss the Consolidated Amended Class Action Complaint pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. §§ 78u-4, 78u-5. [DN 51]. Fully briefed, this matter is ripe for decision.

## I. BACKGROUND

Plaintiffs represent a class of investors who purchased the publically traded common stock of Humana, Inc. ("Humana") between February 4, 2008 and March 11, 2008 (the "Class Period"). Defendant Humana is a full-service benefits solutions company offering health and supplemental benefit plans for employer groups, government benefit programs, and individuals. Humana's operations are divided into two business segments: (i) a Commercial segment, which offers products to entities, employer groups, and individuals; and (ii) a Government segment, which offers products and government benefit programs, such as Medicare, Medicaid, and United Stated Department of Defense's TRICARE program. (Humana 2007 Form 10-K at 3.) Defendant, Michael McCallister, was Humana's President, Chief Executive Officer, and a member of Humana's Board of Directors during the class period. Defendant, James Bloem, was Humana's Chief Financial Officer, Senior Vice President, and Treasurer during the class period. Defendant, James Murray, was Humana's Chief Operating Officer during the class period.

Plaintiffs' consolidated amended class action complaint alleges that the Defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission, 17 C.F.R. § 240.10b-5. Plaintiffs allege that Humana and the three chief corporate officers are responsible for a number of intentional or reckless misstatements and material omissions which Plaintiffs' allege were calculated to artificially inflate the price of Humana's stock.

**A. Humana's Prescription Drug Plans ("PDP") under Medicare Part D**

Under the federal Medicare Part D Program, private insurers offer insurance coverage for prescription drugs to Medicare eligible individuals. Under Part D, insurers may offer both: (i) PDPs, which cover only a member's prescription drug purchases; and (ii) plans under the Medicare Advantage Prescription Drug Program, which cover both prescription drugs and medical services. (Humana 2007 Form 10-K at 5-6.) On January 1, 2006, Humana began offering stand-alone PDP's under the federal Medicare Part D Program. A PDP is an insurance plan that helps an individual pay for prescription drugs. Prescription drugs are typically divided into three tiers based upon cost. Each tier has a copay level for covered prescription drugs with the health plan setting the copay for the drugs covered in each tier. Tier I typically includes generic drugs. Tier II typically includes mid-range copay drugs and covered brand-name drugs that have been selected as Tier II drugs. Tier III typically includes drugs with the highest copay and includes all other covered prescription drugs.

Humana offers three Medicare PDPs, a Standard, Enhanced, and Complete product. Humana's PDP Standard Plan is a basic plan that provides the member with coverage equal to the federal government's minimum requirements. Humana's PDP Enhanced Plan is similar to the Standard Plan, but provides broader coverage and fixed copayments with no deductible for the member to

2

pay.  Humana's PDP Complete Plan is designed for those individuals who need maximum coverage for all of their specific drug needs.  Medicare-eligible individuals may enroll in one of Humana's three plan choices between November 15 and December 31 for coverage that begins January 1. (Consolidated Amended Complaint at ¶ 32-38.)

Humana's revenue from the Center for Medicare and Medicaid Services ("CMS") (the federal agency that administers Medicare programs) and the medicare-eligible member are determined from Humana's bids submitted annually to CMS.  Humana's stand-alone PDP contracts with CMS are renewed generally for a one-year term each December 31.

### B.  Statements

On February 4, 2008, Humana issued a press release reporting its Fourth Quarter and full year 2007 earnings results.  For 2007, Humana earned $1.4 billion on $25.3 billion in revenue, or $4.91 per share.  As part of the February 4, 2008 earnings announcement, Humana raised its 2008 earnings per share ("EPS") guidance to a range of $5.35 to $5.55, and its first quarter EPS guidance to a range of $0.80 to $0.85, forecasting an increase of between 9% to 13% over the prior year. In that press release, Humana stated that it was raising its previously issued earnings guidance for 2008 to reflect a lower tax rate than previously anticipated.  In teleconferences on February 4, 2008, and February 12, 2008, and an investor meeting on February 28, 2008, Defendants reiterated and explained Humana's EPS guidance for 2008 and made additional statements regarding Humana's operations and outlook.

Plaintiffs argue that notwithstanding Defendants' knowledge of Humana's significant internal control problems causing inaccurate pricing and claims data, Defendants knowingly or recklessly issued the February 4, 2008 press release, signed false certifications in the Company's

SEC filing during the class period, and made the following additional false and misleading statements concerning Humana's anticipated earnings. Specifically, on February 4, 2008, Defendant Michael McCallister, Humana's President and CEO, stated in part: (1) "[T]his morning we raised our 2008 earnings per share guidance to a range of $5.35 to $5.55, with continued membership growth and strong operational execution driving these results." (2) "In June of this past year we submitted our 2008 Medicare Plan bids similarly targeting an operating margin of approximately 5%." (3) "We believe that 2007 achievements just described position us well for 2008 both in terms of the existing environment and future trends." (4) "Regardless, as we've done over the past 20 years we will adjust the benefits to ensure the Medicare medical costs trends matches the net level of premium increase." (Consolidated Amended Complaint at ¶ 72.)

Plaintiffs assert that during the February 4, 2008 earnings conference call, Defendant James Bloem, Humana's Chief Financial Officer, likewise made the following false and misleading statements:

- "[T]he 2008 quarterly benefit ratio progression will be less pronounced verses 2007 as shown by the illustration on this slide. The primary factor driving this less pronounced pattern in the composition of our 2008 PDP membership which has changed from last year."

- "Consequently our lower membership in the low income block is anticipated to lower the quarterly benefits ratio pattern in the first half of the year and raise it slightly in the back half of the year compared to 2007."

- "Here's the twofold take away, the composition of our PDP membership will have a significant impact on the quarterly pattern of our Medicare benefits ratio without necessarily impacting the full year ratio. Secondly, the 2008 quarterly Medicare benefits ratio pattern is expected to drive our quarterly earnings per share for this year."

- "Our rigorous benefit expense trend analysis and forecasting includes regular interaction of many disciplines within our organization, this increases the reliability of our commercial pricing and profit planning."

- "Based on our ongoing deep dive analysis of benefit expense trend factors we do not foresee

4

any significant changes to the components of our cost trends as we move into 2008, as is stated in this morning's press release.  Accordingly we remain confident of our ability to meet our 2008 commercial pre-tax earnings target of $280 million to $300 million.  We look forward to sharing our progress with you each quarter."

- In response to a question concerning Humana's PDP benefit ratio for the first quarter of 2008, Defendant Bloem stated "[y]ou are right directionally in terms of the PDP benefit ratio, what we had said, based on the low income fees there is going to be quite a difference in the front end of this year versus last year and it has to do with having fewer low income."

(Id. at ¶ 73.)

During the same February 4, 2008, conference call, Defendant James Murray, Humana's

Chief Operating Officer, responded to a question regarding whether there were any kind of positive

or negative surprises on the PDP upselling so far or the agents sales:

> [I]ts pretty remarkable that we can look and see how much of a spend we have for a particular, for example how much we spend for a cable ad and how many calls that will drive, and then we have statistics around how many of those calls will convert to a lead and how many of those leads will convert to a sale and how many of those sales will result in a referral of a friend or a family member.  I mean it's fairly remarkable and all of the different sales channels that we have, a direct mail versus a cable TV, that is pretty predictable, and there's a lot of levers that we pull.  Nothing has surprised us this year.  We talked last year when we were together that we were surprised with some of our competitors and some of their benefit offerings.  Nothing really has been a big surprise for us this year.

(Humana Conference Call, February 4, 2008 at 3; Consolidated Amended Complaint at ¶ 75.)

Finally, on February 12, 2008, and February 28, 2008, Defendant Bloem and Defendant McCallister

respectively participated in investor meetings and reiterated that Humana expected EPS in the range

of $5.35 to $5.55 for the full year 2008. (Consolidated Amended Complaint at ¶¶ 80, 81.)

Plaintiffs assert that these statements were materially false and misleading because: (i) the

Company had significant material weaknesses in its internal controls such that the Company's

financial reporting lacked a reasonable basis at all relevant times and was therefore materially false

and misleading; (ii) due to the significant material weaknesses in the Company's internal controls,

5

the Company was unable to properly calculate the prescription drug costs of its newly acquired members; (iii) due to the significant material weaknesses in the Company's internal controls, the Company was unable to properly calculate the correct pricing and discounts for members in its PDP plans; (iv) due to the significant material weaknesses in the Company's internal controls, the Company was unable to properly calculate the mix shift of high and low cost members in its PDP plans; and (v) due to the significant material weaknesses in the Company's internal controls, the assumptions underlying Humana's first quarter and full year earnings guidance provided by Defendants in February of 2008 were flawed and therefore materially false and misleading. (Consolidated Amended Complaint at ¶ 82.)

### C.  Humana's Internal Controls

In support of their allegation that Defendants knew or recklessly disregarded the significant internal control problems relating to the pharmacy claims processing and claims data at the Company prior to the start of the class period, the Plaintiffs submit the testimony of two former Humana employees and Humana's second quarter earnings results for the fiscal year 2006. (Consolidated Amended Complaint at ¶¶ 43-70.)

First, Plaintiffs rely in part on information provided by a former Senior Information Technology Consultant at Humana who was employed by Humana from January of 2005 to June of 2008. The former consultant was in charge of Humana's Medicare Part D information technology and ran a project that monitored Humana pricing charged by pharmacies.  (Id. at ¶¶ 43-46.)  The former consultant represented that Humana had very poor internal controls relating to the pharmacy claims processing and claims data.  Humana used a third party, Argus Health Systems, to serve as the interface between Humana and the pharmacies that filled prescriptions for Humana enrollees and

to process claims for Humana.  Argus, and therefore the pharmacies, depended upon accurate pricing and discount information from Humana's Pharmacy Business Unit to accurately charge Humana enrollees.  (Id. at ¶¶ 49-50.)  The former consultant represents that there was complete chaos at Humana with respect to pharmacy claims processing because there was fifteen separate data feeds from Argus to Humana and certain of the feeds were inaccurate.  (Id. at ¶ 51.)

According to the former consultant, Humana actuaries were relying on the flawed data flowing between Argus and Humana, making a great deal of information upon which projections were based inaccurate.  (Id. at ¶ 57.)  The former consultant: (i) advised Pharmacy Business Unit Directors, management level employees and business analysts of these problems and the potential inaccuracies in the claims data (id. at ¶ 56), (ii) told individuals at Humana on many occasions that there were "terrible inaccuracies" in Humana's discounting and pricing within the PDP plan, and that the errors may have been as much as 15% to 20% (id. at ¶ 52), and (iii) in a presentation to "higher-level individuals at Humana with responsibility for Medicare pharmacy information" informed them that the current data-exchange system between Humana, Argus, and the pharmacies regarding pharmacy claim information was seriously flawed and led to inconsistent data being used by different entities within Humana and in contact with Argus (id. at ¶¶ 60-62.).

Second, Plaintiffs assert that a second former Humana employee confirmed that significant internal control problems were present at Humana prior to and during the class period.  The former Humana employee was a Product Manager for Medicare Products from the Spring of 2004 until April of 2008 with job duties that included planning and designing Humana Medicare products and working with CMS to get those products approved.  (Id. at ¶ 65.)  According to the Product Manager, Humana retained the outside actuarial firm of Reden & Anders to help build the plan

7

models for the PDP offerings. However, employees in Humana's PDP actuarial department input the wrong information into the model for developing the PDP plans and the error "snowballed." (Id. at ¶ 67.) According to the Product Manager, Humana failed to perform the mandated peer review of this actuarial work and, thus, the errors were not discovered. (Id. at ¶ 68.)

Third, Plaintiffs assert that Humana's second quarter earnings results for the fiscal year 2006 also support Plaintiffs' contention that Defendants knew or recklessly disregarded the significant internal control problems. On July 31, 2006, Humana issued its second quarter earnings results for the fiscal year 2006 with PDP margins that were lower than expected. Plaintiffs argue that the PDP margins issued hinted at the larger problem with internal controls at Humana. Plaintiffs assert that instead of addressing the internal control problems, Humana instead diverted potential customers of its Complete Plan to a competitor's similar plan preventing the high-cost customers from adversely impacting the Company's PDP revenue. (Id. at ¶¶ 100-106.)

### D.  March 12, 2008 Press Release

Plaintiffs contend that investors did not learn the truth concerning the financial condition of Humana until March 12, 2008, when Humana issued a press release indicating that it was revising downward by $360 million the financial guidance it had provided five weeks earlier and reiterated less than two weeks earlier. Humana cut its guidance by approximately 47% for the first quarter of 2008 ($0.44 to $0.46 versus previous guidance of $0.80 to $0.85 per share) and by approximately 24% for the full year 2008 ($4.00 to $4.25 versus previous guidance of $5.35 to $5.55 per share). As a result of the alleged false statements and material omissions, Plaintiffs assert that the Defendants deceived the investing public regarding Humana's business, artificially inflated the price of Humana stock, caused Plaintiffs and other putative class members to purchase Humana stock at

inflated prices, and caused a severe decline in Humana's stock price when the artificial inflation was revealed.

### E.  Humana's Explanation

In the March 12, 2008, press release, Humana explained that the revision of its 2008 earnings guidance was based upon an analysis of its members' actual pharmacy claims made in its stand-alone PDPs through February 2008.  In a March 12, 2008, teleconference with investors and analysts, the Individual Defendants explained that in preparing the bids for Humana's 2008 PDPs in early 2007, Humana re-categorized some prescription drugs that were originally in the lower cost Tier II as higher cost Tier III drugs for 2008.  When Humana made these changes, Humana's actuaries, who prepared the bids, assumed incorrectly that its members would utilize the same amounts of those drugs in 2008 as they did in 2007, notwithstanding the change in the tiers and the corresponding increase in members' copayments.  (March 12, 2008, Humana Conference Call Transcript at 3.)  Because copayments for drugs in Tier III are higher than Tier II, Humana explained that the movement of certain drugs to a higher tier increased the Company's calculated member cost. As a result, in order to comply with the member cost threshold allowed by CMS, Humana lowered the copayments payable by its members.  (Id.)

In March of 2008, based on two full months of actual claims experience, Humana concluded that its PDP members had substituted lower cost Tier II drugs for certain higher cost Tier III drugs. (Id. at 3.)  Because Humana did not take into account the likelihood of this substitution in its 2008 PDP bids, Humana was now bearing a higher share of its members' drug costs than it had projected as a result of the reduced copayments.  Since Humana lowered the copayments that its members were required to pay, its PDPs were cheaper than those of competitors and, as a result,

9

approximately 188,000 new high-utilization/high-cost members enrolled in Humana's Enhanced Plans.  Additionally, due to the favorable pricing structure of Humana's PDPs, the proportion of low-income/high-utilization members assigned to Humana's Standard Plans by CMS did not decrease as Humana had predicted.  Humana characterized the cause of the 2008 earnings guidance revision as a mistaken actuarial assumption in Humana's PDP bids.  (Id.)

## II.  STANDARD OF REVIEW

Upon a motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), the Court "must construe the complaint in the light most favorable to plaintiffs, accept all well-pled factual allegations as true and determine whether plaintiffs undoubtedly can prove no set of facts consistent with their allegations that would entitle them to relief." League of United Latin American Citizens v. Bredesen, 500 F.3d 523, 527 (6th Cir. 2007) (citing Kottmyer v. Maas, 436 F.3d 684, 688 (6th Cir. 2006)).  This standard requires more than bare assertions of legal conclusions.  Bovee v. Coopers & Lybrand C.P.A., 272 F.3d 356, 361 (6th Cir. 2001). "[A] complaint must contain either direct or inferential allegations respecting all the material elements to sustain recovery under some viable legal theory." Bredesen, 500 F.3d at 527 (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 1964-65 (2007)).

## III.  SECTION 10(b) OF THE SECURITIES EXCHANGE ACT

The Plaintiffs allege that the Defendants violated the "anti-fraud" provision, § 10(b), of the Exchange Act, 15 U.S.C. § 78j(b).  In relevant part, § 10(b) provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement . . . , any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the

Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). The S.E.C. regulation promulgated under § 10(b) provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. The basic elements of a cause of action under this anti-fraud provision are "(1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance (or transaction causation); (5) economic loss; and (6) loss causation." Brown v. Earthboard Sports USA, Inc., 481 F.3d 901, 917 (6th Cir. 2007) (citing Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005)). In securities fraud claims based on statements of present or historical fact, scienter can be established by knowledge or recklessness. PR Diamonds, Inc. v. Chandler, 364 F.3d 671, 681 (6th Cir. 2004) (citing Helwig v. Vencor, Inc., 251 F.3d 540, 552 (6th Cir. 2001)); Grillo v. Tempur-Pedic International, Inc., 553 F. Supp. 2d 809, 817 (E.D. Ky. 2008). Recklessness is defined as "'highly unreasonable conduct which is an extreme departure from the standards of ordinary care. While the danger need not be known, it must at least be so obvious that any reasonable man would have known of it.'" Miller v. Champion Enterprises, Inc., 346 F.3d 660, 672 (6th Cir. 2003) (quoting Mansbach v. Prescott, Ball & Turben, 598 F.2d 1017, 1025 (6th Cir. 1979)). As discussed more fully below, different scienter requirements apply to forward-looking statements pursuant to the PSLRA's "safe harbor" provision. Grillo, 553 F. Supp.2d at 817 n. 2 (quoting PR Diamonds, 364 F.3d at 681 n. 3).

Traditionally, a party alleging fraud under the anti-fraud provision of the Exchange Act was required to "state with particularity the circumstances constituting fraud[,]" but was permitted to generally allege "[m]alice, intent, knowledge, and other conditions of a person's mind . . . ." Fed. R. Civ. P. 9(b); PR Diamonds, 364 F.3d at 682.  Under this pleading standard, plaintiffs were permitted to plead scienter generally.  However, in enacting the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Congress created § 21D of the Exchange Act, 15 U.S.C. § 78u-4, which heightened this pleading standard.  Section 21D(b)(2) requires that:

> In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u-4(b)(2).  In imposing this heightened pleading standard, "'the PSLRA did not change the scienter that a plaintiff must prove to prevail in a securities fraud case but instead changed what a plaintiff must plead in his complaint in order to survive a motion to dismiss.'" Chandler, 364 F.3d at 682 (quoting Hoffman v. Comshare, Inc. (In re Comshare, Inc. Sec. Litig.), 183 F.3d 542, 548-49 (6th Cir. 1999)).  Therefore, if a plaintiff does not plead "with particularity facts giving rise to a strong inference" of scienter, i.e. knowledge or recklessness, "a court may, on any defendant's motion, dismiss the complaint." Id. (citing 15 U.S.C. § 78u-4(b)(3)).

"The Supreme Court recently clarified the process courts should use in determining whether a securities fraud complaint gives rise to a 'strong inference' of scienter as required by the PSLRA." Grillo, 553 F. Supp.2d at 818 (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 127 S. Ct. 2499, 2502-03 (2007)).  First,  as when ruling upon any other Rule 12(b)(6) motion, the Court must "accept all factual allegations in the complaint as true." Tellabs, 127 S.Ct. at 2509

12

(citation omitted). Second, the Court "must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss . . . ." Id. "The inquiry is whether all the facts alleged, taken collectively, give rise to a strong inference of scienter." Grillo, 553 F. Supp.2d at 818; Tellabs, 127 S.Ct. at 2509. Third, in determining whether the alleged facts give rise to a strong inference of scienter, the Court is to perform a "comparative inquiry" by taking "into account plausible opposing inferences." Tellabs, 127 S.Ct. at 2509. The facts alleged in the complaint, when considered in their entirety, give rise to a strong inference of scienter "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. at 2510. "[W]here two equally compelling inferences can be drawn, one demonstrating scienter and the other supporting a nonculpable explanation, Tellabs instructs that the complaint should be permitted to move forward." Frank v. Dana Corp., 547 F.3d 564, 571 (6th Cir. 2008).

In Helwig v. Vencor, Inc., 251 F.3d 540 (6th Cir. 2001), the Sixth Circuit listed factors, that while not exhaustive, are probative of scienter in securities fraud cases:

> (1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

Id. at 552. See also Ley v. Visteon Corp., 543 F.3d 801, 917 (6th Cir. 2008).

Defendants move to dismiss the Consolidated Amended Complaint arguing that (1) the

13

statements were forward-looking statements and thus Plaintiffs' claims are barred by the PSLRA's

safe-harbor provision, 15 U.S.C. § 78u-5(c), and the "bespeaks caution" doctrine, (2) Plaintiffs fail

to allege facts giving rise to a strong inference of "scienter," (3) the statements are immaterial

puffery, (4) the Plaintiffs fail to plead loss causation, and (5) Plaintiffs fail to plead claims for

control person liability under § 20(a) of the Exchange Act.

## IV. DISCUSSION

### A. Safe Harbor Provision

Defendants assert that the majority of their statements concerning Humana's EPS guidance

for 2008 are protected by the safe harbor provision set forth in 15 U.S.C. § 78u-5. The PSLRA

provides that under certain circumstances a person or entity shall not be liable with respect to any

written or oral forward-looking statements.  15 U.S.C. §78u-5(c)(1), (2).  The PSLRA defines

"forward looking statements" broadly to include projections of future financial results, statements

of plans and objectives for future operations, and statements of future economic performance.  15

U.S.C. § 78-5(i).[1]  Specifically, the safe harbor provision provides that "in any private action arising

---

[1] The PSLRA defines "forward-looking statement" as

(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

(B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

(C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;

(D) any statement of the assumptions underlying or relating to any statement

14

under this chapter that is based on an untrue statement of a material fact or omission of a material fact necessary to make the statement not misleading," a company or entity shall not be held liable with respect to any written or oral forward-looking statement to the extent that:

> (A) the forward-looking statement is--
>> (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or
>> (ii) immaterial; or
> (B) the plaintiff fails to prove that the forward-looking statement--
>> (i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or
>> (ii) if made by a business entity; was--
>>> (I) made by or with the approval of an executive officer of that entity; and
>>> (II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

15 U.S.C. § 78u-5(c)(1).   "In other words, if a forward-looking statement is accompanied by meaningful cautionary language, the issuer is immune from liability and state of mind is irrelevant." Beaver County Retirement Bd. v. LCA-Vision, Inc., 2009 WL 806714, *10 (S.D. Ohio March 25, 2009)(citing Miller v. Champion Enter., Inc., 346 F.3d 660, 672 (6th Cir.2003)); 15 U.S.C. § 78u-5(c)(1)(A).   "If the statement is not accompanied by meaningful cautionary language, the plaintiff must allege specific facts giving rise to a strong inference that the misleading statement was made with actual knowledge that the statement was misleading."   Id. (citing Miller, 346 F.3d at 672-73);

---

> described in subparagraph (A), (B), or (C);
>
> (E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer; or
>
> (F) a statement containing a projection or estimate of such other items as may be specified by rule or regulation of the Commission.

15 U.S.C. § 78u-5(i)(1).

15 U.S.C. § 78u-5(c)(1)(B).  See also PR Diamonds, Inc., 364 F.3d at 682 n. 3; In re Huffy Corporation Securities Litigation, 577 F. Supp. 2d 968, 990 (S.D. Ohio 2008); Helwig, 251 F.3d at 547.

Plaintiffs contend that Defendants' statements are not entitled to immunity under the PSLRA's safe harbor.  Plaintiffs argue that some of the statements at issue are not forward-looking statements, that the false guidance statements are not accompanied by meaningful cautionary language sufficient to warn investors of the risk, and that they have adequately alleged that Defendants' statements regarding the Company's earnings guidance were knowingly false when made.

### 1.  Forward-looking statements

Plaintiffs' concede that some of the Defendants' statements, including the revised earnings per share guidance, made in the February 4, 2008 press release and corresponding conference calls concern future economic performance or objectives, and as such, are forward-looking as defined in the PSLRA.  See Beaver County Retirement Bd., 2009 WL 806714, *10 ("guidance, or projections, are by definition forward-looking statements").  However, Plaintiffs identify six present-tense or historical statements that they contend do not qualify for protection under the safe harbor provision of the Exchange Act:

- "In June of this past year we submitted our 2008 Medicare Plan bids similarly targeting an operating margin of approximately 5%." (Consolidated Amended Complaint at ¶ 72.)

- "We believe that 2007 achievements just described position us well for 2008 both in terms of the existing environment and future trends." (Id.)

- "Regardless, as we've done over the past 20 years we will adjust the benefits to ensure the Medicare medical costs trends matches the net level of premium increase." (Id.)

16

- "Our rigorous benefit expense trend analysis and forecasting includes regular interaction of many disciplines within our organization, this increases the reliability of our commercial pricing and profit planning." (Id. at ¶ 73.)

- "[I]ts pretty remarkable that we can look and see how much of a spend we have for a particular, for example how much we spend for a cable ad and how many calls that will drive, and then we have statistics around how many of those calls will convert to a lead and how many of those leads will convert to a sale and how many of those sales will result in a referral of a friend or a family member." (Id. at ¶ 75.)

- "Nothing has surprised us this year. We talked last year when we were together that we were surprised with some of our competitors and some of their benefit offerings. Nothing really has been a big surprise for us this year." (Id.)

In response, Defendants agree that four of these statements are present or historical statements. The Court will address these four statements separately in Section IV(B) of this Opinion. Defendants contend that two of the statements identified by Plaintiffs are actually forward-looking: (1) "We believe that 2007 achievements just described position us well for 2008 both in terms of the existing environment and future trends;" and (2) "Regardless, as we've done over the past 20 years we will adjust the benefits to ensure the Medicare medical costs trends matches the net level of premium increase."

The Court agrees with the Defendants. These statements appear to be forward-looking. The statements refer to being positioned well for 2008 and adjusting benefits in the future to ensure Medicare medical cost trends match premium increases. These statements imply "projections or objectives" and thus fall within the definition of forward-looking statements. Miller, 346 F.3d at 678. See also Hess v. American Physicians Capital, Inc., 2005 WL 459638, *6 (W.D. Mich. January 11, 2005); Harris v. Ivax Corp.,182 F.3d 799, 803 (11th Cir. 1999)(statements that defendant's "fundamental business and its underlying strategies remain intact" and that it is "well positioned" were forward-looking). While both statements imply some present facts or circumstances, they are

17

the basis for the later forward-looking statements, and thus qualify as assumptions underlying or relating to a forward-looking statement.  <u>Miller</u>, 346 F.3d at 677 (statements that "given the continuation of outstanding earnings growth and the successful implementation of our retail strategy" while implying some present circumstances is the basis for the later forward-looking statements and qualifies as an "assumption underlying" a forward-looking statement); <u>Hess</u>, 2005 WL 459638, *6 ("[w]e accomplished our major objectives . . . in 2002" and "our focus on our current business has resulted in outstanding persistency" qualifies as assumptions underlying forward-looking statements); 15 U.S.C. § 78u-5(i)(1)(D)(a forward-looking statement includes a statement of the assumptions underlying or relating to any forward-looking statements).

### 2. Cautionary Language

Plaintiffs do not dispute that Defendants' business projections and guidance were accompanied by cautionary language.  Instead, Plaintiffs argue that the Court cannot evaluate the adequacy of Defendants' cautionary language on a motion to dismiss.  Plaintiffs further contend that these statements were not accompanied by *meaningful* cautionary statements sufficient to warn investors of risks that posed concerns to Humana's financial health.  According to Plaintiffs, the cautionary language accompanying Humana's press release, teleconferences, investor meetings, and SEC filings consisted of merely boilerplate disclaimers and were "so broad that they apply to *any* business that sells products to consumers." (Plaintiffs' Response at 31(quoting <u>Yanek v. Staar Surgical Co.</u>, 388 F. Supp. 2d 1110, 1123 (C.D. Cal. 2005)).

First, Plaintiffs argue that the adequacy of cautionary language is typically a jury question and should not be decided upon a motion to dismiss.  Contrary to Plaintiffs' argument, the Sixth Circuit recognizes that applicability of the safe harbor provision of the PSLRA is appropriately

considered on a motion to dismiss.  See Miller, 346 F.3d at 677-78 (affirming dismissal because, among other things, meaningful cautionary language protected the defendants' forward-looking statements); Helwig, 251 F.3d at 554 ("Congress apparently intended the applicability of the safe harbor to be addressed even on a motion to dismiss."); 15 U.S.C. § 78u-5(e)(instructing courts to consider "any cautionary statement accompanying the forward-looking statement" upon a motion to dismiss based on the safe harbor provisions); In re Huffy Corp. Securities Litigation, 577 F. Supp. 2d at 1013 n. 45 ("[T]his Court rejects the Plaintiffs' assertion . . . that the question of whether a particular statement has been immunized by the safe harbor provision in the PSLRA cannot be resolved when ruling on a motion to dismiss . . . .").

Second, the Plaintiffs maintain that the statements were not accompanied by meaningful cautionary language to qualify for protection under the safe harbor provision.  In order to be protected by the safe harbor provision of the PSLRA, these statements identified as forward-looking must also have been accompanied by "meaningful cautionary language."  Miller, 346 F.3d at 677. "'The cautionary statements must convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statements, such as, for example, information about the issuer's business.'" Helwig, 251 F.3d at 558-559 (quoting H.R. Conf. Rep. No. 104-369, at 43 (1995), U.S. Code Cong. & Admin. News at 742); 15 U.S.C. § 78u-5(c)(1)(A)(i)).   "[B]oilerplate warnings will not suffice."  Id. (citation omitted). "'[C]autionary statements must be substantive and tailored to the specific future projections, estimates, or opinions . . . which the plaintiffs challenge."  Helwig, 251 F.3d at 559 (citation omitted).  However, the PSLRA does not require companies to warn of "'the particular factor that ultimately causes the forward-looking statement not to come true" in order to receive protection

under the safe harbor provision. <u>Harris</u>, 182 F.3d at 807. "'In short, when an investor has been warned of risks of a significance similar to that actually realized, she is sufficiently on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward.'" <u>Helwig</u>, 251 F.3d at 559 (quoting <u>Harris</u>, 182 F.3d at 807).

Defendants' cautionary language here was extensive and specific, and accordingly, "meaningful." At the time Humana issued the February 4, 2008, press release, Humana identified its earnings guidance and statements contained in the news release as "forward-looking" within the meaning of the PSLRA and specifically warned investors that its guidance "may be significantly impacted by certain risks and uncertainties" described in its previous filings with the SEC. (February 4, 2008, Press Release at 1.) Similarly, in the teleconferences and meetings with investors and securities analysts on February 4, February 12, and February 28, Humana representatives at the outset of each of those calls and meetings (i) stated that the presentation included forward-looking statements and (ii) directed participants to Humana's SEC filings which warned of the risks and uncertainties that could impact those forward-looking statements. (Transcript of Humana Conference Call on Feb. 4, 2008 at 1; Humana UBS Global Healthcare Service Conference Presentation on Feb.12, 2008 at 2; Humana Merrill Lynch Investor Meetings Presentation on Feb. 28, 2008 at 2.)

Humana's SEC filings contained a detailed list of specific factors and uncertainties that could affect its future economic performance, including its earnings guidance. <u>See</u> Humana 2006 Form 10-K (February 23, 2007); Humana Form 10-Q (October 29, 2007); Humana 2007 Form 10-K (February 25, 2008). Humana included in its list of risk factors uncertainties related to the Company's internal controls which Plaintiffs assert was responsible for Humana's incorrect earnings

projections.  Specifically, Humana warned:

> Our business depends significantly on effective information systems and the integrity and timeliness of the data we use to run our business. . . . Our ability to adequately price our products and services, provide effective and efficient service to our customers, and to timely and accurately report our financial results depends significantly on the integrity of the data in our information systems.  As a result of our past and on-going acquisition activities, we have acquired additional information systems.  We have been taking steps to reduce the number of systems we operate, have upgraded and expanded our information systems capabilities, and are gradually migrating existing business to fewer systems.  Our information systems require an ongoing commitment of significant resources to maintain, protect and enhance existing systems and develop new systems to keep pace with continuing changes in information processing technology, evolving industry and regulatory standards, and changing customer preferences.  If the information we rely upon to run our business was found to be inaccurate or unreliable or if we fail to maintain effectively our information systems and data integrity, we could have operational disruptions, have problems in determining medical cost estimates and establishing appropriate pricing, have customer and physician and other health care provider disputes, have regulatory or other legal problems, have increases in operating expenses, lose existing customers, have difficulty attracting new customers, or suffer other adverse consequences.

(Humana 2007 Form 10-K at 18; Humana 2006 Form 10-K at 18.); see also id. at 19 ("Failure to adequately protect and maintain the integrity of our information systems and data may result in a material adverse effect on our financial positions, results in operations and cash flows.")

Humana's cautionary language also warned explicitly that its expected earnings were susceptible to risks associated not only with inaccuracies in Humana's data and information systems, but also in the design and pricing of its products.  Humana specifically warned investors that failure by the Company to "design and price our products properly and competitively" could cause its profitability to decline.  (Humana Form 10-Q (October 29, 2007) at 26.)  See also Humana 2006 Form 10-K at 17 ("[I]f we lose accounts with favorable medical cost experience while retaining or increasing membership in accounts with unfavorable medical cost experience, our business and results of operations could be materially adversely affected.")  Similarly, Humana also informed

investors of the manner in which it calculated future benefit and medical claims, the numerous risks associated with its estimation of the costs of the claims and other expenses, and the potential impact of these items on the profitability of the company. (Humana 2007 Form 10-K at 16) ("We estimate the costs of our future benefit claims and other expenses using actuarial methods and assumptions based upon claim payment patterns, medical inflation, historical developments, including claim inventory levels and claim receipt patterns, and other relevant factors."); see also Humana 2006 Form 10-K at 16). Humana expressly identified numerous factors that could potentially "cause actual health care costs to exceed what was estimated and used to set [Humana's] premiums," including "increased use of medical facilities and services, including prescription drugs; . . . our membership mix; variances in actual versus estimated levels of cost associated with new products, benefits or lines of business, product changes or benefit level changes." Id.

The cautionary language used gave investors particular information about the effect that utilization of inaccurate benefit claims information and the effect that possible variances in actual verses estimated levels of cost associated with new products, benefits or benefit level changes could have on Humana's financial health. Humana's cautionary statements provided investors company and industry specific-risks and described their impact on Humana's financial results. This cautionary language  warned of risks similar to those that ultimately led Humana to revise its earnings guidance downward on March 12, 2008.   The Court finds that these "'cautionary statements are not vague or blanket disclaimers, but instead are substantive, extensive, and tailored to the future-looking statements they reference.'" Institutional Investors Group v. Avaya, Inc., 564 F.3d 242, 258 (3d Cir. 2009)(citation omitted). Furthermore, contrary to Plaintiffs' argument, these warnings cannot be characterized as vague or boilerplate simply because Humana made them more

22

than once.  In re Kindred Healthcare, Inc. Securities Litigation, 299 F. Supp. 2d 724, 739 (W.D. Ky. 2004) ("Simply because [a warning] is repeated does not classify it as 'boilerplate.'").

For these reasons, the Court concludes that the forward-looking statements were accompanied by meaningful cautionary language.

### 3.  Actual Knowledge

Finally, Plaintiffs contend that the safe harbor provision does not apply because they have sufficiently alleged that the Defendants had actual knowledge of the internal control problems which led to the inaccurate earnings guidance.  Plaintiffs' allegation that the Defendants had actual knowledge of the internal control problems "does not save the claim because the existence of the meaningful cautionary statement renders the issuer's state of mind irrelevant."  Beaver County Retirement Bd., 2009 WL 806714, *14.   See Miller, 346 F.3d at 672("[F]or "forward-looking statements" that are accompanied by meaningful cautionary language, the first prong of the safe harbor provided for in the PSLRA makes the state of mind irrelevant."); Harris v. Ivax Corp., 182 F.3d 799, 803-04, 808 n. 10 (11th Cir.1999)(quoting H.R. Conf. Rep. 104-369, at 44 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 743 ("The first prong of the safe harbor requires courts to examine only the cautionary statement accompanying the forward-looking statement. Courts should not examine the state of mind of the person making the statement.").

### B.  Present or Historical Statements

Defendants argue that the remaining four present-tense or historical statements not covered by the PSLRA's safe harbor provision are not actionable under Section 10(b) or Rule 10b-5 because Plaintiffs fail to plead facts to support their claim that these statements were false or misleading when made.  "[T]he PSLRA requires that the complaint 'specify each statement alleged to have been

misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.'" <u>PR Diamonds</u>, 364 F.3d at 681(quoting 15 U.S.C. § 78u-4(b)(1)).

In their Consolidated Amended Complaint, Plaintiffs identified the following statement as false or misleading: "In June of this past year we submitted our 2008 Medicare Plan bids similarly targeting an operating margin of approximately 5%." (Consolidated Amended Complaint at ¶ 72.) While arguing that this statement is a present or historical statement, Plaintiffs do not contest that Humana submitted its 2008 Medicare Plan bids in June of 2007 or that those bids targeted a 5% operating margin. In as much as Plaintiffs challenge as misleading the actual target set by Humana, this operating margin target is a projection or objective related to the Company's operating margin for Medicare Plan bids, and as such, falls squarely within the PSLRA's definition of forward-looking statements. Accordingly, the Court finds that this statement is not actionable under Section 10(b) of the Exchange Act.

Plaintiffs likewise plead no facts to support the assertion that the statement by Mr. James Bloem, Chief Financial Officer at Humana, that "[o]ur rigorous benefit expense trend analysis and forecasting includes regular interaction of many disciplines within our organization, this increases the reliability of our [C]ommercial pricing and profit planning" (<u>id.</u> at ¶ 73) was false or misleading. A review of the February 4, 2008, teleconference reveals that this statement related to Humana's Commercial business segment and not its Medicare/PDP business. There is no allegation that Humana's Commercial business played any role in the 2008 earnings guidance reduction. Furthermore, Plaintiffs also fail to plead with particularity that the described analysis and forecasting

for Humana's Commercial products was false or misleading when made. Plaintiffs securities' fraud claim centers around internal data and control problems related to the PDP pricing and claims information, not Humana's Commercial products.

Finally, Plaintiffs fail to allege the reason or reasons why the remaining statements are false or misleading. In the February 4, 2008, teleconference, Michael McCallister, President and Chief Executive Officer of Humana, discussed Medicare sales stating in relevant part:

> Turning to Medicare sales, we're pleased with the results we're seeing to date with January Medicare Advantage net enrollment up 100,000. The components of this increase include higher retention levels than we had originally expected indicative of the loyalty of our senior members. Gross individual sales are on track while group sales continue to prove challenging as employers continue a wait and see approach.

(Humana Conference Call, February 4, 2008 at 3.) During the question and answer portion of the conference call, Matt Perry with Wachovia initially asked a question related to Humana's spending associated with the Medicare Advantage program. Mr. Perry then asked: "And from your comments, it sounds like attrition is a little bit lower and then the group sales are also a little bit lower, any kind of positive or negative surprises on the PDP upselling so far or the agent sales?" (Id. at 16-17.) In response, Jim Murray stated as follows:

> You know, Mike talked about this in some of his remarks. **It's pretty remarkable that we can look and see how much of a spend we have for a particular, for example how much we spend for a cable ad and how many calls that will drive, and then we have statistics around how many of those calls will convert to a lead and how many of those leads will convert to a sale and how many of those sales will result in a referral of a friend or a family member.** I mean, its fairly remarkable, and all of the different sales channels that we have, a direct mail versus a cable TV, and so that is pretty predictable, and there's a lot of levers that we pull. **Nothing has surprised us this year. We talked last year when we were together that we were surprised with some of our competitors and some of their benefit offerings. Nothing really has been a big surprise for us this year.**

(Id.) Plaintiffs allege that the statements in bold were false and misleading.

With respect to the statement that "[n]othing has surprised us this year," Jim Murray's response addressed a question related to surprises encountered in Humana's effort to upsell current PDP members into Medicare Advantage plans offered by Humana or in agent sales. Contrary to Plaintiffs' implication, this statement does not address surprises in Humana's PDP pricing and claims information. Plaintiffs have not demonstrated with particularity how the challenged statements regarding Humana's efforts to upsell PDP plan members into Medicare Advantage plans or Humana's agent sales were false or misleading when made. In fact, Plaintiffs have not alleged that PDP upselling or agents sales in any way contributed to the revised earnings guidance. Similarly, with respect to Mr. Murray's discussion of cable advertising and its relation to insurance sales, Plaintiffs fail to plead facts demonstrating that Humana cannot trace its cable advertising to sales of its insurance products. Further, as discussed above, the question and subsequent answer are related to Humana's Medicare Advantage program and not Humana's PDP program pricing and claims information. As a result, Plaintiffs fail to plead facts to support its allegation that these statements were false or misleading.

In sum, the alleged misrepresentations by Humana are either protected by the PSLRA's safe harbor provision for forward-looking statements or are not actionable because Plaintiffs failed to plead sufficient facts to support the claim that the present or historical statements were false or misleading. Accordingly, Humana's motion to dismiss the Plaintiffs' claims under §10(a) and Rule 10b-5 is granted.

### C. Plaintiffs' Section 20(a) Claim Is Dismissed As A Matter Of Law

Control person liability under Section 20(a) is contingent upon the Plaintiffs' ability to prove a primary violation under Section 10(b). PR Diamonds, Inc., 364 F.3d at 696. Because Plaintiffs

have not established a primary violation under Section 10(b), the Section 20(a) claim is hereby dismissed as well.

### V.  CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that the motion by the Defendants, Humana Inc., Michael McCallister, James Bloem, and James Murray, to dismiss the Consolidated Amended Class Action Complaint [DN 51] is **GRANTED**.

cc: counsel of record